James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawai'i  96793
Telephone:  (808)242-4956
Facsimile:  (808)249-0668
E-mail: jfosbinder@iff-law.com

Attorneys for Plaintiffs
WATOSHINA LYNN COMPTON

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 28 2011

at ___ o'clock and ___ min. ___ M
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAI'I

| | |
|---|---|
| WATOSHINA LYNN COMPTON,<br><br>    Plaintiffs,<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; BANK OF AMERICA CORPORATION; BAC HOME LOANS SERVICING, LP; U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE FOR CSMC MORTGAGE-BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-7; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS; U.S. BANK NATIONAL ASSOCIATION; JOHN AND MARY DOES 1-10,<br><br>    Defendants. | Civil No. CV11 00198ACK      RLP<br><br>COMPLAINT; DEMAND FOR JURY TRIAL; EXHIBIT "1" - "9"; SUMMONS |

[1]

## COMPLAINT

Plaintiff WATOSHINA LYNN COMPTON (hereinafter "Plaintiff"), by and through their attorney, JAMES H. FOSBINDER, of IVEY, FOSBINDER, FOSBINDER LLLC, a limited liability law company, bring the following Complaint and allege and aver as follows:

## JURISDICTION AND VENUE

1.   Jurisdiction arises under 28 U.S.C. § 1331 (Federal Question Jurisdiction) and the Sherman Anti-Trust Act, 15 U.S.C. § 2.

2.   Jurisdiction also arises under 28 U.S.C. § 1332 (Diversity Jurisdiction).

3.   This Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367(a) because state law claims are so related to the federal claims that they form part of the same case or controversy. These claims all arise out of the same controversy and sequence of events. This Court has jurisdiction over state claims asserted under Hawai'i Revised Statutes ("HRS") by virtue of pendent jurisdiction.

4.   Venue is proper in the United States District Court for the District of Hawai'i, pursuant to 28 U.S.C. § 1391, in that Defendants systematically conduct and transact substantial business in this State and District as licensed banks and corporations organized and/or operating in the State of Hawai'i,

the causes of action occurred in this District, and Plaintiff resides in this District.

## PARTIES

**Plaintiff Defendant**

5. Plaintiff WATOSHINA LYNN COMPTON is, and at all relevant times was, over the age of eighteen and resides at 61 Ala Hele Place, Kihei, in the County of Maui, State of Hawai'i (TMK (2) 3-9-003-064)(the "Subject Property").

**Countrywide Defendants**

6. Defendant COUNTRYWIDE FINANCIAL CORPORATION ("Countrywide Financial") was, at all relevant times, a Delaware Corporation with its principal executive offices located at 4500 Park Granada, Calabasa, California. Countrywide Financial was a holding company which, through its subsidiaries, engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States. As discussed below, Countrywide Financial merged with and became a wholly owned subsidiary of Bank of America in 2008.

7. Defendant COUNTRYWIDE HOME LOANS, INC. ("Countrywide Home"), a direct wholly owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business in Calabasas, California. Countrywide Home originates

[3]

and services residential home mortgage loans. Countrywide Home served as the original lender of Plaintiff's home mortgage loan.

8. The Defendants identified in ¶¶ 6-7 are hereinafter collectively referred to as the "Countrywide Defendants".

**Bank of America Defendants**

9. Defendant BANK OF AMERICA CORPORATION ("Bank of America") is a successor to Defendant Countrywide, as described in ¶¶ 42-47. On July 1, 2008, Countrywide Financial completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly owned subsidiary of Bank of America that was created for the sole purpose of facilitating the acquisition of Countrywide, pursuant to an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and Countrywide Financial. Bank of America has assumed Countrywide's liabilities, having paid to resolve other litigation arising from any future misconduct allegedly committed by Countrywide. At the time of Bank of America's purchase of Countrywide, a Bank of America spokesperson publicly stated: "We bought the company and all of its assets and liabilities… We are aware of the claims and potential claims against the company and have factored there into the purchase." Bank of America is a successor-in-interest to the Countrywide Defendants and is thus

vicariously liable for the conduct of the Countrywide Defendants alleged herein.[1]

10. Defendant BAC HOME LOANS SERVICING, LP ("BAC Home Loans Servicing") is a limited partnership and subsidiary of Bank of America with its principal offices at 4500 Park Granada, Calabasas, California. BAC Home Loans Servicing is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP FNA Countrywide Home Loans Servicing, LP", indicating that it was formerly known as Countrywide Home Loans Servicing LP, the Countrywide subsidiary responsible for servicing Countrywide's mortgage loans after they were originated.

11. The Defendants identified in ¶¶ 9-10 are hereinafter collectively referred to as the "Bank of America Defendants".

12. Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware and is a wholly-owned subsidiary of MERSCORP, Inc. ("MERSCORP"). MERS operates an electronic registry designed to track servicing rights and ownership of mortgage loans (promissory notes) in all

---

[1] In a securities fraud action brought by the United States Securities and Exchange Commission ("SEC") against three former senior executives of Countrywide Financial, the federal court noted that "Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using its Countrywide name in April 2009." *Securities and Exchange Commission v. Mozilo*, No. 09-CV-3994, 2010 WL 3656068, at *2 n.2 (C.D. Cal. Sept. 16, 2010).

fifty states in the United States. MERS acts solely in an administrative capacity as an agent for the owner of the notes.

13. Defendant U.S. BANK NATIONAL ASSOCIATION ("U.S. Bank") is, and at all relevant times was, a nationally chartered bank with its principal executive offices located in the State of Ohio. U.S. BANK provides a range of financial services including, *inter alia*, lending and depository services, cash management, foreign exchange and trust and investment management services. Defendant U.S. Bank was the Trustee for CSMC Mortgage-Backed Pass-Through Certificates, Series 2006-7 (the "Trust"), pursuant to a Pooling and Servicing Agreement, dated as of July 1, 2006 ("PSA"). Relevant portions of the PSA are attached hereto collectively as Exhibit 1.

14. Defendants JOHN AND MARY DOES 1-10 ("Does Defendants 1-10), inclusive, are individuals, partnerships, corporations, associations or any other entity. Plaintiff reserves the right to amend this Complaint to add any such party as described in this paragraph as such party's identity is ascertained through discovery or otherwise.

ECONOMIC BACKGROUND TO THIS COMPLAINT[2]

**Traditional Role of Banks**

15. The role of banks has changed in the last two decades. Traditionally, banks profited by charging borrowers a higher interest rate on the repayment of its loans than they paid to depositors. The obligation to repay the loan was recorded on, and remained in, the books of the original lender until such time as the loan was repaid in full. Lenders were therefore inextricably invested in the ability of the borrower to repay the loan. In other words, the bank held the risk of the borrower's potential default.

16. Real estate investments were traditionally made based on an expected appreciation in the value of the land over time. Speculative trading in mortgage-based assets by institutional investors in open securities markets were primarily achieved by investing in a corporation (or other entity) set up to buy and sell interests in real property. It was not possible for investors in open markets to speculate on individual family homes.

17. Land records, including, mortgages, deeds of title, and assignments of mortgages were recorded in the Hawai'i Bureau

---

[2] The economic processes that have given rise to this Complaint involve complex financial schemes and esoteric terminology. For this reason, Plaintiff respectfully requests that this Court allow general background information in order to clarify the economic reality of these financial arrangements.

of Conveyances or the Assistant Registrar of the Land Court (or both) by the original lender. Each of these records was publicly available and the chain of title transparent.

**Securitization and Mortgage-backed Assets**

18. Securitization has fundamentally changed the way banks and other financial market participants conduct business. A "securitization" is a financial transaction in which assets – in this case, mortgages – are pooled and securities representing interests in the pool are issued to investors.

19. In the instant case, "mortgage-backed securities" ("MBS") are debt obligations that represent claims to the cash flows from pools of mortgage loans, most commonly on residential property. The originating lenders (banks or mortgage companies) sell the mortgage loans to "special purpose vehicles" ("SPV"); typically US-style trusts established specifically to facilitate the securitization.

20. The SPV may hold the mortgage on its balance sheet or place it in a separate trust. In either case, the SPV sells bonds to investors and uses the proceeds from these bond sales to pay the originating lender for the mortgage.

21. Originating lenders no longer have to wait 30 years (on a traditional 30-year fixed rate mortgage) to be repaid. Rather, securitization requires the originating lender to

immediately sell the mortgage to an SPV and, therefore, is immediately repaid. This process creates several inherent moral hazards. First, the lender no longer carries the risk associated with the borrower's potential default and, consequently, no longer has the same economic incentives to ascertain the creditworthiness of the borrower. Second, the "originate and distribute" model of mortgage lending incentivizes lenders to maximize the number of loans that are issued without regard to the risks of those loans.

### Consolidation and Growth of Top-Tier Financial Institutions

22. With the mortgage industry booming in the last 15 years, large banks began acquiring smaller subprime lenders.[3] Not only did the big banks want the fees generated by subprime mortgages, these mortgages would feed the banks' own securitization business. The wave of mergers consolidated economic and political power in a handful of megabanks, among them Citigroup, Bank of America, J.P. Morgan, Chase, First Union, and Wells Fargo. The passage of the Gramm-Leach-Bliley

---

[3] Among the top 25 subprime lenders, First Franklin was bought by National City and later by Merrill Lynch; Long Beach Mortgage was bought by Washington Mutual; Household Finance was bought by HSBC; BNC Mortgage was bought by Lehman Brothers; Advanta was bought by JPMorgan Chase; Associates First Capital was bought by Citigroup; Encore Credit was bought by Bear Stearns; and American General Finance was bought by AIG (Simon Johnson, "13 Bankers," Id. at page 128, citing Alyssa Katz, Our Lot: How Real Estate Came to Own Us (New York: Bloomsbury, 2009), 70; Center for Public Integrity, Who's Behind the Financial Meltdown? The Top 25 Subprime Lenders and Their Wall Street Backers, available at:
http://www.publicintegrity.org/investigations/economic_meltdown/the_subprime_25/.

Act in 1999 meant that investment banking – including buying, selling, trading mortgage-backed securities – was now given a government bail-out guarantee previously only given to traditional banks.

23.    The term "too big to fail" ("TBTF") refers to certain financial institutions that are so large and interconnected that they cannot be allowed to go into uncontrolled bankruptcy; defaulting on their obligations will create significant losses for other financial institutions, potentially triggering a domino effect that causes the entire financial system to collapse.[4]

24.    What makes a financial institution too big to fail is the amount of collateral damage that its uncontrolled failure could cause.  This damage can take several different forms.  A failing institution could have thousands of open transactions with counterparties, which are largely other financial institutions.[5]  A failing bank may have sold credit default swap ("CDS") protection on various securities; its counterparties are assuming that they are perfectly hedged because of those swaps.

---

[4]    For example, the bankruptcy of Lehman Brothers ("Lehman") in September 2008 accelerated the collapse of American International Group ("AIG"), forcing it rely on funds from the Federal Reserve.  Lehman's failure also caused a sudden loss of confidence in all money market funds; in turn, the flood of money out of the money market funds cause the commercial paper market to freeze, thus endangering the ability of many corporations to operate on a day-to-day basis.  The sequence of failures was only stopped by massive government rescue measures.

[5]    For example, at the time of its collapse, the face value of AIG's open derivatives contracts was $2.7 trillion – $1 trillion of it was held by only twelve financial institutions.

However, when the bank fails, suddenly those hedges disappear and the counterparties are forced to take large losses on the underlying securities.

25. Beyond the collateral damage that large interconnected financial institutions inflict on the financial system, TBTF institutions create significant problems for society as a whole.

26. First, when TBTF institutions come to the brink of failure, they have to be bailed out, usually by the government (and taxpayers). A TBTF bank cannot be allowed to go into ordinary bankruptcy procedure because its creditors and counterparties would be cut off from their money supply for months, which could be fatal. This means that government must keep failing banks afloat and, without and, without a credit threat of bankruptcy to negotiate with, must honor all of the bank's obligations; in other words, the money the bank lost has to be made up with public funds.

27. The second problem to society is that TBTF institutions have a strong incentive to take excessive risk, since the government effectively guarantees their losses in an emergency. All banks are highly leveraged, which means that they are betting with other people's money. There are many strategies – of which, securitization is the most popular – that increase returns for shareholders (and executives) while shifting potential losses onto someone else.

28. The third and arguably most significant problem for society is that TBTF banks are bad for competition and therefore bad for the economy. Because large "megabanks" have an implicit government guarantee, bond investors are willing to lend them money at lower interest rates than their smaller competitors. This subsidy makes it harder for smaller banks to compete, deterring new entrants and only strengthening the long-term process of consolidation and concentration in the financial sector.

29. By 2008, the big banks became bigger. Bank of America bought Countrywide. Merrill Lynch's assets grew from $1.7 trillion to $2.3 trillion – from 2007 to 2009. JPMorgan Chase absorbed Bear Stearns and Washington Mutual grew from $1.6 to $2 trillion. JPMorgan Chase, Bank of America, and Wells Fargo had to be exempted from a federal rule prohibiting a single bank from holding more than 10% of all deposits in the U.S. They were also exempted from Dept. of Justice antitrust guidelines intended to limit monopoly power in specific metropolitan regions. By 2009, these three banks controlled half the market for new mortgages.[6]

30. At present, there are at least six banks that are considered too big to fail – Bank of America, Citigroup, Goldman Sachs, JPMorgan Chase, Morgan Stanley, and Wells Fargo. Of

---

[6] Simon Johnson, 13 Bankers. Id., at 180.

these six megabanks, four – Bank of America, Wells Fargo, Citigroup and JPMorgan Chase – maintain over 63% of the market share for mortgage originations.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### Defendant Countrywide's Business Acts and Practices

31. The Countrywide Defendants originated mortgage loans and home equity lines of credit ("HELOCs") through several channels, including a retail channel. The Countrywide employees who marketed, sold or negotiated the terms of mortgage loans and HELOCs directly to consumers in the retail channel, are referred to herein as "loan officers".

32. Countrywide maintained sophisticated databases by means of which corporate management could obtain information regarding Countrywide's loan production status, including the types of loan products, the number and dollar volume of loans, the underwriting analysis for individual loans, and the number of loans which were approved via underwriting exceptions. The Countrywide Defendants used this information, together with data they received relating to secondary market trends, to develop and modify the loan products that Countrywide offered and the underwriting standards that Countrywide applied.

33. In 2004, the Countrywide Defendants set out to double Countrywide's share of the national mortgage market to 30% through a deceptive scheme to mass produce loans for sale on the

secondary market.   The Countrywide Defendants viewed borrowers
as nothing more than the means for producing more loans,
originating loans with little or no regard to borrowers' long-
term ability to afford them and to sustain homeownership.

34. Countrywide Defendants employed various lending
policies to sell ever-increasing numbers of loans, including (a)
the dramatic easing of Countrywide's underwriting standards; (b)
the increased use of low- or no-documentation loans which
allowed for no verification of stated income or stated assets or
both, or no request for income or asset information at all; (c)
placing borrowers in "piggyback" second mortgages in the form of
higher interest rate HELOCs while obscuring their total monthly
payment obligations; and (d) encouraging borrowers to enter into
higher risk mortgages with a promise to modify or refinance
loans at a later date.

35. Moreover, the Countrywide Defendants created a high-
pressure sales environment that propelled its branch managers
and loan officers to meet high production goals and close as
many loans as they could without regard to the borrower's
ability to repay.   The Countrywide Defendants' high-pressure
sales environment also drove loan officers to sell the riskiest
types of loans such as hybrid adjustable rate mortgages ("Hybrid
ARMs") (described below), because loan officers could easily
sell such loans by deceptively focusing borrowers' attention on

the low initial monthly payments or interest rates.   In pushing borrower's into the riskiest types of loans, loan officers intentionally misrepresented the full, true and plain options available to borrowers.

36.   The abovementioned business practices of the Countrywide Defendants are not unknown.   In 2008, the Attorney General of the State of California filed a complaint against Countrywide ("California Complaint") alleging, inter alia, that:

(a)   The primary purpose of Countrywides' deceptive business practices was to maximize profits from the sale of loans to the secondary market;

(b)   Countrywide engaged in deceptive practices in the sale of complex and risky loans to consumers, including Hybrid ARMS;

(c)   Countrywide eased and disregarded underwriting standards in order to increase its market share;

(d)   Countrywide engaged in deceptive marketing practices to sell increasing numbers of loans; and

(e)   In order to increase market share, Countrywide created a high-pressure sales environment where employees were rewarded for selling as many loans as they could without regard to borrowers' ability to repay;

37. The California Complaint resulted in a $8.68 billion nation-wide settlement. The settlement was aimed at enabling borrowers to avoid foreclosure by, inter alia, obtaining modified or affordable loans.

**Countrywide Defendants' and Bank of America Defendants'
Deceptive Practices in Loan Modification**

38. Loan modifications allow mortgage services to change the terms of borrowers' original mortgage terms, and have been a cornerstone of public and private efforts to preserve home ownership in the recent financial crisis. Through the modification process, servicers, like Bank of America, reduce borrowers' interest rates, extend their loan terms, and/or forgive or forebear principal in order to reach a monthly mortgage payment that borrowers can afford.

39. There have been numerous complaints filed against BAC Home Loans Servicing and its parent company, Bank of America, alleging systemic fraud and deceptive practices in the modification process. Recently, the attorneys general of Arizona and Nevada brought complaints against Bank of America alleging that Bank of America routinely provided inaccurate and deceptive reasons for denying modification requests. The attorneys general further allege that BAC customer service representatives are instructed to mislead homeowners who call to inquire about the status of their loan modifications.

40.  In both Arizona and Nevada, hundreds of complaints have been filed and investigated by the Attorneys General's Offices.  In both states, the similarities in allegations are striking.  Bank of America's deceptions routinely include, but are not limited to, the following:

(a)  Consumers must be delinquent on their mortgage payments in order to be considered for loan modifications, even though their delinquency is not a condition of federal programs or Bank of America's own loan modification programs;

(b)  Bank of America would make decisions on modifications within a specified time frame, although the Bank kept many consumers waiting months longer than promised;

(c)  Bank of America would not foreclose upon consumers' homes while modification requests were pending or while homeowners were making trial modification payments when, in many instances, it did initiate foreclosure;

(d)  Bank of America had approved loan modifications, when it had not; and

(e)  Bank of America would convert consumers to permanent modifications if and when they made the payments

[17]

required by trial modification agreements when, in fact, it did not.

41. The purpose of such deception is clearly to delay or otherwise hinder the modification process. The attorneys general complaints indicate that the deceptive and misleading practices committed by Bank of America and BAC Home Loans Servicing are systemic.

**Defendant Bank of America is Vicariously Liable for the Acts of the Countrywide Defendants**

42. As Countrywide's successor in liability, Bank of America is jointly and severally liable for any and all damages resulting to Plaintiffs from the wrongful actions of the Countrywide Defendants. Bank of America itself has acknowledged that its acquisition of all of Countrywide's assets through an all-stock transaction on July 1, 2008 was a "merger". In a July 2008 press release, Barbara Desoer, identified as the head of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide, said: "Now we begin to combine the two companies and prepare to introduce our new name and way of operating." According to Bank of America, it "anticipates substantial cost savings from combining the two companies," from eliminating employment positions, and from reducing overlapping technology, vendor and marketing expenses. Desoer added that "the company is expected to benefit by leveraging its broad

[18]

product set to deepen relationships with existing Countrywide customers."

43. Desoer was also interviewed for the May 2009 issue of Housing Wire, which reported that one of the assets that Bank of America acquired with Countrywide was a vast technology platform for originating and servicing loans, and Desoer says that the bank will be migrating some aspects of Bank of America's mortgage operations over to Countrywide's platforms.

44. Bank of America also reported to the Securities and Exchange Commission ("SEC") that on November 7, 2008, Countrywide Financial and Countrywide Home "transferred substantially all of their assets and operations to [Bank of America]." This transfer of assets was "in connection with the integration of Countrywide Financial Corporation with [Bank of America's] other businesses and operations." Countrywide also ceased submitting filings to the SEC, which are now submitted as part of Bank of America's filings. Further, Bank of America has taken responsibility for Countrywide's pre-merger liabilities, including restructuring hundreds of thousands of loans created and serviced by Countrywide and paying billions of dollars in settlements.

45. A spokesperson for Bank of America confirmed: "We bought the company and all of its assets and liabilities." Similarly, a January 23, 2009 New York Times article quoted

Kenneth D. Lewis (who at the time was Bank of America's Chairman and CEO), acknowledging that Bank of America had factored Countrywide's liabilities into the price it paid to acquire Countrywide: "We looked at every aspect of the deal, from their assets to potential lawsuits and we think we have a price that is a very good price."

46. Consistent with its assumption of Countrywide's liabilities, on October 6, 2008, Bank of America settled lawsuits brought against Countrywide by state Attorneys General by agreeing to loan modifications, an agreement valued up to $8.4 billion. Bank of America also agreed to pay $150 million to help Countrywide customers who were already in or were at serious risk of foreclosure, and an additional $70 million to help Countrywide customers who had already lost their homes to make the transition to other living arrangements. In 2008, Bank of America restructured 300,000 home loans of which 87% had been originated or serviced by Countrywide. On January 3, 2011, Bank of America paid $2.8 billion to government sponsored enterprises Freddie Mac and Fannie Mae to settle claims of misrepresentations on billions of dollars in loans that went sour after Fannie and Freddie bought them from Countrywide. In exchange for the payments, Freddie Mac and Fannie Mae agreed to drop their demands that Bank of America buy back the mortgages. The payment of $1.28 billion to Freddie Mac settled 787,000 loan

claims (current and future) sold by Countrywide through 2008. The payment of $1.34 billion (after applying credits to an agreed upon settlement amount of $1.52 billion) to Fannie Mae settled repurchase claims on 12,045 Countrywide loans (with approximately $2.7 billion of unpaid principal balance) and other specific claims on 5,760 Countrywide loans (nearly $1.3 billion of unpaid principal balance).

47. Upon information and belief, Bank of America has been operating Countrywide Home effectively as a division of Bank of America. To that end, on April 27, 2009, Bank of America announced that "[t]he Countrywide brand has been retired." Bank of America advised that it is operating the Countrywide home loan and mortgage businesses as a "division" named Bank of America Home Loans, which "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans." The Bank of America Home Loans division is headquartered at Countrywide's offices in Calabasas, California.

**The Role of MERS**

48. In the mid-1990s, mortgage bankers created MERS to facilitate the mortgage securitization system where hundreds of thousands of mortgage loans were (and still are) packaged and

bundled as securities for sale to investors in the secondary market.

49. In a 2006 published opinion, the New York Court of Appeals described MERS system as follows:

> In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages. Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system.
>
> The initial MERS mortgage is recorded in the County Clerk's office with 'Mortgage Electronic Registration System, Inc.' named as the lender's nominee or mortgagee of record on the instrument. During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system. In the MERS system, the mortgagor is notified of transfers of servicing rights pursuant to the Truth in Lending Act, but not necessarily of assignments of the beneficial interest in the mortgage.
>
> Merscorp, Inc., v. Romaine, 8 N.Y.3d 90 (N.Y. 2006) (footnotes omitted).

50. According to MERS, MERS was chosen as nominee for the lender and its assigns in these mortgages, for the purpose of "immobilizing the mortgage lien" while transfers of the promissory notes and servicing rights could continue to occur

without the expense of recordation (MERS' own explanation of what it does, from the reported case, *Mortgage Electronic Systems, Inc. v. Nebraska Department of Banking and Finance, 704 N.W. 2d. 884, 786 (2005)*).

51. Immobilizing the mortgage lien makes it very difficult for a borrower to track the holder of his or her note because mortgages are no longer assigned, and therefore, new holders of the notes do not record assignments of the deeds of trust when they purchase mortgages. This, according to MERS, has saved their members in excess of $2.4 Billion in recording fees. However, it has simultaneously cancelled any transparency of its actions, which would be otherwise evident had the recordings been properly entered in the County Register of Deeds offices.

52. Thus, MERS was designed essentially as a privately run, national registry of mortgages under which MERS would act as the record "owner" and depository of all mortgages participating in the system, while the mortgage notes and loans themselves were freely bought and sold on the secondary market.

53. Attorneys general from all 50 states are investigating the poor record keeping by MERS, banks, and the servicers (companies that collect mortgage payments). The Federal Reserve is investigating whether mortgage companies have cut corners in the foreclosure process, using "robo-signers" to sign thousands

of mortgage assignments and foreclosure documents without having made the legal investigation required to execute such documents.

54.  About 50% of all U.S. mortgages participate in the MERS system.  Under any test for market power, MERS and its shareholders control the national mortgage industry, the foreclosure assistance industry, and the digital identification of real property.  The monopolistic power of MERS was challenged in 2008 by Ocwen Loan Servicing LLC, when it claimed that "[w]ithout access to MERS, Ocwen cannot compete because it will be denied access to a business element necessary for effective competition."  See, *Ocwen Loan Servicing LLC v. Mortgage Electronic Registration Systems, Inc., Civ. 1:08cv824, (U.S. Dist. Ct., E.D. Va., filed August 8, 2008)*.

55.  In order to become a member of MERS, lenders must agree to be "bound" by the provisions of the MERS Membership Rules and Bylaws ("MERS Membership Rules").  The MERS Membership Rules govern loan servicing and foreclosure practices.  MERS's control over its members, and therefore over the way in which the majority of the mortgage industry is operated, was made apparent when, due to political and legal pressure, MERS issued a press release announcing that it would disclose the names and contact information for investors that purportedly held promissory notes secured by mortgages.  Prior to this press release, it was uniform practice among MERS members to withhold

the identity of investors. However, because it was a MERS policy, all members were obligated to comply.

56. It is evident that MERS has the ability to impose guidelines on its members' lending practices. In doing so, MERS effectively acts as a conduit for anti-competitive behavior. By dictating uniform policies with which lenders must comply (or face exclusion), MERS effectively reduces the ability of banks to establish their own lending practices. This, ultimately, harms the borrower to the extent that borrowers no longer provided with meaningful options in respect of their mortgage loans.

57. MERS standardized the practice of mortgage loan securitization. By circumventing traditional recordation processes, MERS facilitated the subsequent proliferation of subprime and otherwise predatory loans, which were originated by its members (big banks) for the purpose of being sold in the secondary market.

**Plaintiff's Mortgage Loan with Defendant Countrywide Home**

58. Plaintiff purchased the Subject Property in 2003 with a privately financed construction loan with Mid Pacific Loans on Maui. For the following two years, Plaintiff invested significant time and expense in developing her home. She built a house and detached Ohana, installed a pool and landscaped the

[25]

property.   In 2005, she sought to refinance her loan with Mid Pacific Loans.

59.   On May 18, 2006, Plaintiff executed a promissory note (the "Promissory Note" or "Note") agreeing to pay U.S. $920,000.00 to Countrywide Home as "Lender" (attached hereto as Exhibit 2).   On the same day, Plaintiff entered into a mortgage (the "Mortgage") granting a security interest in the Subject Property to Countrywide Home (attached hereto as Exhibit 3). The Mortgage was recorded in the State of Hawai'i Bureau of Conveyances on May 25, 2006 (Document No. 2010-121805).

## Plaintiff's Attempts to Obtain a Loan Modification through BAC Home Loans Servicing

60.   Plaintiff is the sole owner and operator of a fiberglass pool business.   She has operated the business profitably since October 2006.   Plaintiff supplements her income from the pool business with two investment properties from which she receives $9,000 per month.

61.   In or around August 2008, Plaintiff's pool business suffered a significant downturn in revenue as a result of the broader economic recession.   In anticipation of her reduced earnings, Plaintiff contacted Countrywide Home to inquire about the process of modification.   On or around October 10, 2008, Plaintiff spoke with "Sean" from BAC Home Loans Servicing (at extention 4607).   She asked him to explain how the loan

modification process worked. "Sean" explained the different options available for loan modification, forbearance and what documentation would be required to obtain a modification. He also advised Plaintiff that she had to be at least 30 days behind on her mortgage payments in order to qualify for a loan modification. Plaintiff attempted to call "Sean" back on October 14, 2008 to inquire further about the modification process. She left a message, which was never returned.

62. Between October 2008 and May 2009, Plaintiff continued making timely payments on her mortgage. However, her pool business continued to suffer decreased revenues and on May 1, 2009 she was not able to make her first mortgage payment.

63. On May 1, 2009, Plaintiff contacted BAC Home Loans Servicing Home Retention Division ("BAC Home Retention Division") and spoke with a customer service representative, "Ryan" (at extension 23483). By the end of the following day, Plaintiff had faxed to BAC Home Retention Division (to Ryan's attention) all documents that were required to begin her loan modification. Plaintiff completed all of the documents included in the modification request package and sent it back to BAC Home Retention Division. Plaintiff called BAC Home Retention Division every other day to check on the status of her loan modification. On two occasions Ryan requested additional documentation, which Plaintiff immediately faxed.

64.  Plaintiff was informed that she had been assigned a negotiator, "Alexis Nellum" ("Alexis") from the Arizona modification center (at extension 9047).  Plaintiff was put in contact with Alexis who informed Plaintiff that she had received all documents and information necessary to submit the loan modification request to BAC Home Retention Division.  Alexis stated that she would call Plaintiff once a decision had been made in respect of Plaintiff's loan modification.  Alexis also provided Plaintiff with her e-mail address (alexis.nellum@bankofamerica.com) so that Plaintiff could correspond directly with her.  Approximately a week later, Plaintiff sent Alexis an e-mail to inquire as to the status of her loan modification.  Alexis quickly called Plaintiff for the sole purpose of haranguing her for e-mailing her.  "Alexis" provided no information about Plaintiff's loan modification. The conversation was short and pointed and Alexis was palpably distressed and angered at the fact that Plaintiff had inquired as to the status of her modification via e-mail.

65.  Following this telephone conversation with Alexis, Plaintiff attempted to contact another representative at BAC Home Retention Division; however, several subsequent attempts were disconnected shortly into the conversation.  When Plaintiff was finally able to speak with a representative, "Daniel" (at extension 449395), she was informed that her file had been

[28]

closed. According to notes left by Alexis, Plaintiff's file was closed because it "sat on the lenders desk for too long" and had expired. As such, Alexis was purportedly obligated to close the file. Plaintiff was never officially or formally informed of BAC Home Loans Servicing decision on her loan modification.

66. Shortly thereafter, Plaintiff resubmitted her documents to BAC Home Retention Division and was assigned another negotiator, "Tracy" (at extension 476932). Tracy would not allow Plaintiff to correspond with her via e-mail and stated that all communication must be done via telephone. Plaintiff was instructed to send in more documents, which she did, via facsimile, immediately after that telephone conversation with Tracy. The following day, Plaintiff called Tracy to confirm that she had received the documents. Tracy confirmed that she had received all documents required to process her loan modification request.

67. The following week, Plaintiff called and spoke to a customer service representative (whose name Plaintiff did not record) to inquire as to the status of her modification. Plaintiff was informed that her file had, once again, been closed; however, this time, her account was closed due to insufficient information. Plaintiff informed the customer service representative that she had confirmed with Tracy the day before that all documentation and information necessary to

process her loan modification had been received. The customer
service representative could not provide Plaintiff with a reason
why Plaintiff's file had been closed on account of insufficient
information despite being told that all necessary information
had been received. Plaintiff was never contacted for additional
information during the time she spoke with Tracy and the time
her file was closed.

68. Plaintiff then spoke with Ryan, the customer service
representative with home she had initially spoken. Ryan stated
that he would resubmit her application, but that in order to do
so, Plaintiff would have to resend all of the documents.
Plaintiff immediately complied and faxed over all documents
again, **for the third time.** Plaintiff called the following week
and was informed that her modification request was being fast-
tracked.

69. In August 2009, Plaintiff had to travel to Washington
to attend to a family emergency. Plaintiff communicated with
BAC Home Retention Division modification department from
Washington every other day and was told that her modification
request was under review.

70. On August 29, 2009, Plaintiff received confirmation by
BAC Home Retention Division that her modification had been
approved and that, in order to accept the terms of the loan
modification, Plaintiff needed to sign and return the enclosed

documents. Plaintiff completed all required documents and had the documents notarized and sent back to BAC Home Retention Division.

71. Several days later, Plaintiff called BAC Home Retention Division and spoke with "Linda Pawlowski" ("Linda") who informed her that her modification documents were incomplete because the notary had not signed the documents correctly. However, when asked, Linda was unable to provide Plaintiff with exactly how the notary signature was deficient. Linda advised Plaintiff that if she got the documents re-notarized and sent back to BAC Home Retention Division by September 28, 2009, then her loan modification would be finalized.

72. On September 18, 2009 Plaintiff had the loan modification documents re-notarized and on September 28, 2009 at 1:18pm, sent, via FexEx, the completed documents to BAC Home Retention Division. Plaintiff called on September 30, 2009 to confirm that her documents were received. Plaintiff spoke with "Jorge Chaves" ("Jorge") (at extension 3471). Jorge informed Plaintiff that, again, her modification request could not be completed on account of an incorrect notary signature. Again, Jorge, when asked, could not tell Plaintiff exactly how the notary signature was deficient.

73. Plaintiff requested the documents be resent to her along with an explanation of how the notary signature was

[31]

deficient.  However, Jorge informed Plaintiff that the documents could not be reprinted as they had expired and that Plaintiff would have to reapply for a loan modification and resubmit, **for a fourth time**, all supporting documents.  Jorge explained that it would take another 30-45 days to process the subsequent request.  Plaintiff expressed to Jorge her concern that Countrywide Home / Bank of America may foreclose on her property before her modification can be finalized.  However, Jorge assured Plaintiff that, because she was still under modification review, she would not face foreclosure.

74.  Plaintiff submitted a new loan modification request and resubmitted all of her supporting documents on October 2, 2009.  On October 5, 2009, Plaintiff called BAC Home Retention Division to confirm that her modification request and supporting documents had been received and submitted for review.  However, the customer service representative with whom she spoke was unable to confirm receipt of her documents.  Plaintiff made repeated calls over the next week.  She spoke with "Felix" on October 7, 2009, "Roberta" on October 12, 2009, and both "Sean" and "Kimbra" on two separate calls on October 14, 2009.  In each of these calls, none of the customer service representatives were able to confirm that BAC Home Retention Division had received her documents.

75.  On October 16, 2009, Plaintiff immediately asked that she speak with a supervisor.  She spoke with "Tea Barret" ("Tea") (at extension 445398).  Tea advised plaintiff that her modification request was under review and that she had been assigned a new negotiator "Ashley Anderson".  On October 22, 2009 Plaintiff spoke with "Tracy" who advised Plaintiff that her modification was still under review.

76.  On October 26, 2009, Plaintiff spoke with "Andre", who also advised Plaintiff that her modification request was still under review.  Andre assured Plaintiff that her modification request would be accepted, given that she had been approved once before (on August 29, 2009).  Andre also assured Plaintiff that her home would not be foreclosed upon given that she was still under review for loan modification.

77.  On November 2, 2009, Plaintiff spoke with "Vicki" (at extension 7661), who advised Plaintiff that she was under pre-foreclosure, but that, because she was still under loan modification review, the foreclosure process would be stalled until final determination of her modification.  Plaintiff asked if there was any further information or documentation that BAC Home Retention Division needed to process her modification. Vicki confirmed that they had all necessary information but advised Plaintiff to make a $6300 payment (the original mortgage

[33]

amount) and that she would have the negotiator, Ashley Anderson, contact her.  Plaintiff was never contacted by the negotiator.

78.  Throughout the months of November and December, Plaintiff made numerous inquiries as to the status of her loan modification and was advised that it was still under review.

79.  On January 28, 2010, Plaintiff spoke with a supervisor at BAC Home Retention Division, "Mathew", who advised Plaintiff that her modification was still under review, but that she had been assigned a new negotiator, "Shamika Smith".  Plaintiff requested that Shamika contact her directly; however, Plaintiff has not received any communication from the negotiator.  Over the next two months, Plaintiff made number inquiries as to the status of her loan modification and was advised that it was still under review.

80.  On April 14, 2010, Plaintiff spoke with another BAC Home Retention Division customer service representative, "Jill", who advised Plaintiff that she had been assigned another negotiator, "Yasime Cox".  Plaintiff asked Jill to have the Yasmine contact Plaintiff directly; however, Plaintiff has not received any communication from the negotiator.

81.  On May 7, 2010, Plaintiff spoke with another customer service representative, "Steve", who advised Plaintiff that she had been assigned yet another negotiator, "Lynnette Carlson".  Plaintiff asked Steve to have Lynnette contact her; however,

[34]

Plaintiff has not received any communication from the negotiator.

82. On June 30, 2010, Plaintiff spoke with another BAC Home Retention Division customer service representative, "Patricia", who advised Plaintiff that she had been assigned another negotiator, "Shanetta". Patricia would not provide Shanetta's surname. Plaintiff asked Patricia to have Shanetta contact her; however, Plaintiff has not received any communication from the negotiator.

83. On July 14, 2010, Plaintiff spoke with BAC Home Retention Division customer service representative, "Brian" who advised Plaintiff that her loan modification had been created and that it had been sent to the lenders for approval. Plaintiff called back the following week to inquire as to the status of the approval. Plaintiff spoke with customer service representative, "George", who advised Plaintiff that it could take up to 45 days for approval.

84. On July 29, 2010, Plaintiff called BAC Home Retention Division to check the status of the modification approval. Plaintiff spoke with "Janine" who advised Plaintiff that she needed to submit updated supporting documents, including pay check stubs, 2008 and 2009 tax returns, two months of bank statements and a hardship letter (collectively, the "Updated Documents"). Plaintiff explained that she was self employed and

[35]

did not have paycheck stubs and that she had filed an extension for her 2009 taxes. Janine advised Plaintiff to fax the 2008 tax returns, the paperwork from her tax advisor who had filed the extension and the bank statements. Plaintiff faxed all of the above requested documentation on August 2, 2010.

85. Plaintiff called BAC Home Retention Division on August 6, August 9, and August 11, 2010 to confirm whether or not they had received the Updated Documents. Each time, Plaintiff was told that BAC Home Loans Servicing had not received any of Updated Documents. During the August 11, 2010 call, Plaintiff was told that a BAC Home Retention Division customer service representative had been assigned to locate the Updated Documents.

86. On August 13, 2010, Plaintiff received a call from "Tiffany", a customer service representative, who asked Plaintiff to resubmit the Updated Documents. Plaintiff faxed the Updated Documents again on August 17, 2010. On August 18, 2010, Tiffany called Plaintiff to inform her that BAC Home Retention Division had received the Updated Documents and that her modification request was being updated accordingly. At that time, Tiffany informed Plaintiff that her modification request was still under review and that it would be in review for approximately two more months before a Plaintiff can expect the modification to be finalized.

[36]

87. On August 23, 2010, Plaintiff called BAC Home Loans Servicing to check the status of her modification. She was told that the modification request was still under review. On August 26, 2010, Plaintiff learned that a Notice of Mortgagee's Intention to Foreclose Under Power of Sale ("Notice of Foreclosure") had been issued and recorded into the Hawai'i Bureau of Conveyances on August 23, 2010. Plaintiff also learned that, on August 26, 2010 an auction date had been posted in respect of the foreclosure on the Subject Property.

88. On August 27, 2010, Plaintiff called BAC Home Retention Division to ask why she had been foreclosed upon given that her modification request was still under review and that she had been given numerous assurances that such foreclosure proceedings would not be initiated while she was under review for modification. Plaintiff spoke with supervisor, "Michelle", who advised her that her file had been closed on August 19, 2010 for lack of documentation. Michelle stated that Plaintiff also needed to provide a profit and loss statement and the 2009 tax return. This information was not in the original request for Updated Documents that Plaintiff complied with when she faxed said documents on both August 2, 2010 and again on August 17, 2010. Michelle also stated that she was unable to reopen Plaintiff's case because Plaintiff's financial documents showed that she had a negative balance of $4000.

89. On September 22, 2010, Plaintiff retained Ivey Fosbinder Fosbinder LLLC to assist in her modification efforts and in respect of the pending foreclosure on the Subject Property

90. On January 24, 2011, Plaintiff contacted BAC Home Retention Division to, again, initiate modification. She spoke with customer service representative "Tiffany". Plaintiff explained that she was already in foreclosure, but that she would like another chance at trying to modify her loan, given the difficulty she had previously experienced in doing so. Tiffany informed Plaintiff that she is not eligible for modification given that BAC Home Retention Division had proceeded with the foreclosure (though U.S. Bank), and that there was nothing else that could be done.

91. On February 11, 2011, Plaintiff contacted BAC Home Retention Division again to request modification. Plaintiff spoke with customer service representative, "Peter". Peter informed Plaintiff that he was unable to locate her account. Plaintiff provided her name, address, account number, and social security number. However, Plaintiff's account seems to have been removed from BAC Home Loans Servicing Home Retention Division.

**Assignment of Mortgage and Notice of Foreclosure**

92.  On August 5, 2010 an Assignment of Mortgage was executed by MERS "solely as nominee" for Countrywide Homes in which it purports to transfer to U.S. Bank, as trustee for the Trust, "all of its right, title and interest in and to that certain mortgage recorded on 05/25/06 in the Bureau of Conveyances, State of Hawai'i, Regular System document number 2006-097686" (attached hereto as Exhibit 4).  The Assignment of Mortgage was recorded in the Bureau of Conveyances on August 23, 2010.

93.  On August 23, 2010, a Notice of Mortgagee's Intention to Foreclose Under Power of Sale ("Notice of Foreclosure") was issued by U.S. Bank as "Mortgagee".

94.

<u>**CLAIM I**</u>
**(Declaratory Relief Against U.S. Bank)**

95.  The Declaratory Judgment Act, 28 U.S.C. § 2201, provides in pertinent part:

> In case of actual controversy within its jurisdiction… any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
>
> *28 U.S.C. § 2201(a).*

[39]

96. Plaintiff submits that an actual controversy exists with respect to whether or not U.S. Bank has the legal authority to foreclose on the Subject Property. As such, Plaintiff requests declaratory judgment to determine that U.S. Bank, in fact, does not have the legal authority to foreclose on the Subject Property for at least the following reasons:

(a) U.S. Bank is not a valid assignee of the Mortgage and therefore has no legal right to enforce the Mortgage. MERS did not have the legal authority to assign the mortgage to U.S. Bank because MERS was, at all times, acting "solely as a nominee" for Countrywide Home.

(b) The original Note was never delivered to subsequent purchasers, but rather remained in the possession of Countrywide Homes thereby clouding any title claims that may arise in respect of the Note.

(c) Even if the court finds that MERS has the legal authority to assign a mortgage as nominee for Countrywide Home, Plaintiff submits that the Mortgage was not assigned to U.S. Bank prior to the "Cut-Off Date" of the Trust, in breach of Section 2.01 of the PSA governing the Trust. As such, the Mortgage was never validly deposited into the Trust and never became part of the assets of the Trust.

**MERS did not have legal authority to assign the Mortgage and, therefore, U.S. Bank is not a valid assignee entitled to enforce the Mortgage.**

97.  With reference to MERS's role in Plaintiff's mortgage loan transaction, the Mortgage states:

> MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee under this Security Agreement (Mortgage at 2).

98.  The Mortgage also purports to contain a transfer to MERS of Plaintiff's rights in the Subject Property as follows:

> This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the [Subject Property].
>
> Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument. (Mortgage at 3 and 4) (emphasis added).

99. The Assignment of Mortgage references the Mortgage and states:

> Mortgage Electronic Registration Systems, Inc. solely as nominee for Countrywide Home Loans, Inc., a New York Corporation, does hereby transfer without recourse to U.S. BANK NATIONAL ASSOCIATION, a National Association, AS TRUSTEE FOR THE HOLDERS OF CSMC 2006-7, whose address is, C/O Bank of America fka Countrywide Home Loans, Inc. TX, Foreclosure Department, 7105 Corporate Dr., MS:PTX-B-35, Plana, TX 75024, all of its right, title and interest in and to that certain mortgage recorded on 05/25/06 in the Bureau of Conveyances, State of Hawai'i, Regular System document number 2006-097686.

100. Plaintiff argues that MERS's "nominee" status and the rights bestowed upon MERS within the Mortgage itself, are insufficient to empower MERS to effectuate a valid assignment of mortgage.

101. There is little to no case law in the State of Hawai'i that interprets the role and legal status of MERS. Recently however, a New York Bankruptcy Court set forth a detailed analysis of the role of MERS because "MERS's role in the ownership and transfer of real property notes and mortgages is at issue in dozens of cases" (*In re Ferrel L. Agard*, Bkrtcy. No. 810-77338-reg (D.N.Y.) at *19). The Court stated that:

> Other than naming MERS as "nominee", the Mortgage also provides that the Borrower transfers legal title to the subject property to MERS, as the Lender's nominee, and acknowledges MERS's rights to exercise certain of the lender's right under state

[42]

law.   This too, is insufficient to bestow
any  authority  upon  MERS  to  assign  the
mortgage.   In Bank of New York v. Alderazi,
the  court  found  "[t]he  fact  that  the
borrower acknowledged and consented to MERS
acting  as  nominee  of  the  lender  has  no
bearing  on  what  specific  powers  and
authority  the  lender  granted  MERS."
Alderazi, 900 N.Y.S.2d at 824.   Even if it
did bestow  some  authority  upon  MERS,  the
court  in Alderazi  found  that  the  mortgage
did not convey the specific right to assign
the mortgage.

102. The court concluded that naming MERS a "nominee" did
not bestow authority upon MERS to assign the mortgage. (Agard,
at 31).

103. In *LaSalle Bank, N.A. v. Bouloute*, No. 41583/07, 2010
WL 3559552, at *2 (N.Y. Sup. Aug. 26, 2010), the court analyzed
the  relationship  between  MERS  and  the  original  lender  and
concluded that a nominee possesses few or no legally enforceable
rights beyond those of a principal whom the nominee serves.   The
court  further  concluded  that  MERS  must  have  some  evidence  of
authority to assign the mortgage in order for the assignment of
a  mortgage  by  MERS  to  be  effective.    Evidence  of  MERS's
authority to assign could be by way of a power of attorney or
some  document  executed  by  the  original  lender  (*See  Bouloute,*
*2010 WL 3559552, at *1*).

104. In Agard, MERS argued that it had authority to act as
"agent" for each and every MERS member which claims ownership of
a note and mortgage registered in its system.   This authority is

[43]

purportedly based on the terms and conditions of a MERS membership agreement. Those terms and conditions provide that "MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time." (Agard, at 26).

105. Under Hawai'i agency laws, an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency § 1.01.* Further, "[i]t is well established that '[a]n agency relationship may be created through actual or apparent authority.'" (*State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, *90 Haw. 315, 325, 978 P.2d 753 (1999) (quoting Cho Mark Oriental Food, Ltd. V. K & K Int'l*, 73 *Haw. 509, 515-16, 836 P.2d 1057, 1061-62 (1992)*).

106. Actual authority exists "only if there has been a manifestation by the principal to agent that the agent may act on his account and consent by the agent so to act, and may be created by express agreement or implied from the conduct of the parties or surrounding circumstances." *State Farm*, 90 Haw. At 325, 978 P.2d at 763 (quoting from *Cho Mark, 73 Haw. At 515-16, 836 P.2d at 1061-62*). Express actual authority "requires an

[44]

oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain things." *Cho Mark, 73 Haw. At 515-16, 836 P.2d at 1061-62.*

107. Because MERS's members, the beneficial noteholders, purported to bestow upon MERS interest in real property sufficient to authorize the assignments of mortgage, the alleged agency relationship must be committed to writing by application of the statute of frauds.

108. Plaintiff submits that neither the Mortgage, nor any other loan document which has been provided to Plaintiff, evidences an agency relationship between MERS and Countrywide. In the absence of such express authorization, Plaintiff submits that the assignment of her Mortgage by MERS to U.S. Bank was not a valid assignment because MERS did not have the legal authority as mere "nominee" of Countrywide to make such an assignment. As a consequence, Plaintiff further submits that U.S. Bank is not a valid assignee of her Mortgage and therefore does not have the legal authority to pursue foreclosure against the Subject Property.

**Countrywide Homes Did Not Effectively Transfer Plaintiff's Original Note Thereby Ensuring a Clear Chain in Title to Plaintiff's Mortgage**

109. An essential aspect of the mortgage securitization process is that the issuing trust for each MBS offering must obtain good title to the mortgage loans comprising the pool for that offering.  This is necessary in order for the MBS holders to be legally entitled to enforce the mortgage loans in case of default.  Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or deed of trust).  The rules that govern these transfers are contained in Hawai'i's Uniform Commercial Code ("UCC") and the terms of the PSA.

110. The right to enforce a promissory note can be transferred only by physical delivery of the original note. Under section 3-301 of the "UCC", a "person entitled to enforce" an instrument means (with certain exceptions not relevant in this case) either "the holder of the instrument" or "a nonholder in possession of the instrument who has the rights of a holder." Thus, section 3-301 ties the enforcement right to possession of the paper.  Section 3-302(a) of the UCC provides that "an instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Under

these sections, no one can enforce (and hence, no one can foreclose a mortgage secured by) a negotiable note unless the note has been delivered to that person.

111. Section 2.01(b) of the PSA requires the Depositor to have delivered or cause to be delivered to the Custodians for the benefit of the Certificateholders, the documents and instruments with respect to each mortgage loan as assigned, including (i) (A) The original mortgage note bearing all intervening endorsements or (B) with respect to any lost mortgage note, a lost note affidavit and indemnity from the Seller stating that the original mortgage note was lost or destroyed; and (ii) the original of any guarantee executed in connection with the mortgage note.

112. Pursuant to the UCC (H.R.S. §§ 490:3-204) and Section 2.01(b) of the PSA, the promissory note and security instrument (mortgage) must be transferred by indorsement (in the same way that a check may be transferred by indorsement) or by sale. Further, the UCC requires that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default (H.R.S. §§ 490:3-201-203).

113. Hawai'i trust law generally requires strict compliance with trust documents, including the PSA. Failure to comply strictly with the timeliness, indorsement, physical delivery or

other requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiff's Mortgage.

114. The Countrywide Defendants, however, routinely failed to comply with the requirements of the UCC and the PSA for valid transfer of Plaintiff's (and others) Note and Mortgage to the Trust. In *Kemp v. Countrywide Home Loans, Inc.*, Bkrtcy. No. 08-18700 (D.N.J.), Countrywide Financial sought to prove that the Bank of New York, was trustee for a residential MBS issuing trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce the mortgage.  Countrywide Financial presented testimony by Linda DeMartini, who had been employed by Countrywide Home Loans Servicing LP ("Countrywide Servicing") for approximately 10 years as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department of Countrywide Servicing.   Ms. DeMartini testified that, Countrywide Home originated Kemp's loan in 2006 and transferred it to the Bank of New York as trustee for the issuing trust, but that Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer of the loan.

115. Even though DeMartini was presented by Countrywide Financial as a witness in an attempt to prove that the loan documents had been validly transferred to the issuing trust, her

testimony, in fact, proved that the loan documents were never validly transferred. She testified that an allonge to the promissory note, which purported to transfer the note to the trust by indorsement, was prepared only in preparation for the litigation in 2009, long after the purported transfer of the note to the trust in 2006, and was never delivered to the trustee. Indeed, she testified that there was no ordinary business practice of signing an allonge at the time a note was purportedly transferred.

116. DeMartini also testified that the original note was retained by Countrywide and was never delivered to the trustee. Most significantly, she testified on direct examination that not delivering the original note to the trustee was Countrywide's standard business practice:

> Q. Ms. DeMartini, is it generally the custom to – for your investor [*i.e.*, the issuing trust] to hold the documents?
>
> A. No. They would stay with us as the servicer.
>
> Q. And are documents ever transferred to the investor?
>
> A. If we service-release them they would be transferred to whomever we're service-releasing them to.
>
> Q. So I believe you testified Countrywide was the originator of this loan?
>
> A. Yes.

Q.   So Countrywide had possession of the documents from the outset?

A.   Yes.

Q.   And  subsequently  did  Countrywide transfer these documents by assignment or an allonge?

A.   Yes.

Q.   And –

A.   Well,  transferred  the  rights,  yes, transferred the ownership, not the physical documents.

Q.   So the physical documents were retained within the corporate entity Countrywide or Bank of America?

A.   Correct.

Q.   Okay.  And would you say that this is standard operating procedure in the mortgage banking business?

A.   Yes.  It would be normal – the normal course of business as the reason that we are the servicer, as we're the ones that are doing all the servicing, and that would include retaining the documents.

117. At  a  subsequent  hearing  in  September  2009,

Countrywide's counsel state that:

[A]lthough…the UCC and the Master Servicing Agreement  apparently  requires  that, procedure seems to indicate that they don't physically move documents from place to place because of the fear of loss and the trouble involved and the people handling them.  They basically execute the necessary documents and retain them as long as servicing's retained.  The documents only leave when servicing is released.

118. Based on the evidence quoted above, Chief Bankruptcy Judge Judith H. Wizmur held in November 2010 that the Bank of New York, as trustee for the issuing trust, could not enforce the mortgage loan for two reasons:

> First, under New Jersey's Uniform Commercial Code ("UCC") provisions, the fact that the owner of the note, the Bank of New York, never had possession of the note, is fatal to its enforcement. Second, upon the sale of the note and mortgage to the Bank of New York, the fact that the note was not properly indorsed to the new owner also defeats the enforceability of the note.
>
> *Kemp v. Countrywide Home Loans, Inc.*, No. 08-18700-JHW, Slip Op., at *10-11 (Bkrtcy. D.N.J. Nov. 16, 2010)

119. The same is true here. Plaintiff submits that U.S. Bank did not obtain good title to the Mortgage comprising the Trust. As part of the securitization process, both the mortgage and the promissory note must be validly transferred in order to be enforceable. Based on the foregoing authority, this requires U.S. Bank to have had possession of the note. Given Countrywide's routine practice of maintaining possession of the note, Plaintiff submits that the required transfer was not validly executed. As such, U.S. Bank does not have the authority to enforce the note.

**U.S. Bank Does Not Hold Title to the Mortgage as it was Not Deposited into Trust Before the Trust Closing Date.**

120. Hawai'i trust law generally requires strict compliance with trust documents, including the PSA. Failure to comply strictly with the time requirements of the PSA with respect to the transfer of the note and security instrument means that the transfer is void and the Trust does not have good title to Plaintiff's Mortgage.

121. Section 2.01 of the PSA governing the Trust into which Plaintiff's Note was purportedly entered, represents and warrants that

> [T]he Depositor has delivered or caused to be delivered to the Custodians for the benefit of the Certificateholders, the documents and instruments with respect to each Mortgage Loan as assigned: (i)(A) the original Mortgage Note…or (B)with respect to any Lost Mortgage Note, a lost note affidavit and indemnity from the Seller stating that the original Mortgage Note was lost or destroyed, (together with a copy of such Mortgage Note, if available).

122. The PSA further represents and warrants in relation to the assignment of a MERS Mortgage Loan that:

> [T]he related Servicer agrees that it will cause, at the Seller's direction and expense, the MERS® System to indicate that such Mortgage Loans have been assigned by the Seller to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased or substituted in accordance with this Agreement) the

> information required by the MERS® System to
> (a) identify the Trustee and (b) identify
> the series of the Certificates issued in
> connection with such Mortgage Loans.  The
> related Servicer shall report to the
> Depositor and the related Custodian the
> status of updating all applicable
> assignments with MERS within 60 days of the
> Closing Date and shall confirm in writing to
> the applicable Custodian once all
> assignments are updated with MERS.

123. In other words, on or before the Closing Date, the original Note must have been delivered or caused to be delivered to the Custodian and, within 60 days after the Closing Date, the Servicer must provide written confirmation to the Custodian evidencing the assignment of the Mortgage.  The Custodians under this PSA are LaSalle Bank, National Association and Wells Fargo Bank, N.A., each of which acts as an agent on behalf of the Trustee, U.S. Bank.

124. Plaintiff submits that neither the Note nor the Mortgage was entered into the Trust in accordance with the terms and conditions of the PSA.  Plaintiff further alleges that the original Note never left the possession of Countrywide.  It is the admitted practice of Countrywide to maintain possession of the original Notes.  There is no evidence that a lost note affidavit was entered into Trust by the Closing Date.  In the absence of evidence to the contrary, Plaintiff alleges that neither the Note nor a valid lost note affidavit was deposited into the Trust prior to the Closing Date.

125. With respect to the assignment of Plaintiff's Mortgage, the evidence clearly indicates that the Mortgage was not assigned to U.S. Bank until August 23, 2010; approximately four years after the Closing Date of the Trust. Plaintiff submits that such retroactive assignment of the Mortgage is not permitted under the terms of the PSA, which makes clear that evidence of assignment must be provided, in written form, no later than 60 days after the Closing Date.

## CLAIM II
### (Breach of Contract Against Bank of America Defendants)

126. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

127. In or around August 2008, as a result of the global financial crisis, Plaintiff's pool business suffered a significant downturn in revenue. In response, Plaintiff sought to modify the terms of her original loan in anticipation of her reduced earnings.

128. On August 29, 2009, Plaintiff entered into a valid and enforceable modification agreement with Defendant BAC Home Loans Servicing ("Loan Modification Agreement") to amend and supplement the Mortgage and Note (attached hereto as Exhibit 5). On August 29, 2009, Defendant BAC Home Loans Servicing sent Plaintiff a notice stating that her loan modification was approved ("Modification Approval Notice") (attached hereto as

Exhibit 6). The Modification Approval Notice further stated that, "[i]n order for the modification to be valid, the enclosed documents need to be signed and returned". The "enclosed documents" consisted of the Loan Modification Agreement and the Step Rate Loan Modification Agreement Addendum ("Step Rate Addendum"), dated as of August 29, 2009 and executed by Plaintiff on September 18, 2009 (attached hereto as Exhibit 7).

129. Pursuant to the Loan Modification Agreement, Plaintiff undertook to pay the unpaid principal balance (which, as of October 1, 2009, was $923,533.90), plus interest, to the order of BAC Home Loans Servicing (as "Lender"). The interest rate was to be charged on the unpaid principal balance at a yearly rate of 4.375% from October 1, 2009 and Plaintiff promised to make monthly payments of principal and interest of $4,894.43 beginning on November 1, 2009.

130. The Step Rate Addendum is incorporated by reference to the Loan Modification Agreement. The Step Rate Addendum specifies that, after November 1, 2009:

> The Interest Rate shall then change on the at [sic] which time the monthly principal and interest payment shall adjust in accordance with the note, adjustable rate rider and/or any other loan document that is affixed or incorporated.
>
> Thereafter, the interest rate and monthly principal and interest payment shall remain the same until such time as the monthly

principal and interest due under the Note are paid in full.

131. While the language of the first paragraph quoted above is unclear with respect to when the monthly principal and interest payments are to adjust, the Modification Approval Notice provides that, effective with the November 1, 2009 payment, the new modified monthly payment will be $5,211.66. This amount includes an escrow account payment of $317.23 per month. The Modification Approval Notice also specifies that the new interest rate of 4.375% is to be fixed for a period of five years.

132. The Modification Approval Notice requires Plaintiff to sign, date and return one complete set of the enclosed documents in a re-usable Fed-Ex envelope no later than September 28, 2009. The Modification Approval Notice also requires, *inter alia*, that the Loan Modification Agreement be signed in the presence of a Notary.

133. Plaintiff complied with each of the requirements set out in the Modification Approval Notice; she executed and dated the Loan Modification Agreement and Step Rate Addendum, the Loan Modification Agreement is signed and stamped by a Notary Public, and the documents were mailed at 1:18 p.m. on September 28, 2009 (see Fed-Ex Receipt attached hereto as Exhibit 8).

134. On September 29, 2009, Defendants BAC Home Loans Servicing sent Plaintiff a letter stating that they had received a copy of the executed loan modification documents but was unable to provide the modification "at this time" ("Revocation Letter") (attached hereto at Exhibit 9).  The Revocation Letter states that Plaintiff's modification was being denied on account of "Incorrect or Incomplete Notary Signatures (Example: Missing Notary Public signature, Missing Notary Public stamp or seal)." The Revocation Letter is a standard form letter that allows BAC Home Loans Servicing to check a box providing reasons for revoking a borrower's modification.  Plaintiff submits that this type of letter is routinely sent out to borrowers seeking modification, including Plaintiff, as a matter of course regardless of whether or not the actual modification documents were reviewed by BAC Home Loans Servicing.

**The Loan Modification Agreement is a valid contract**

135. Under Hawai'i law, a contract "requires an offer and acceptance, consideration, and parties who have the capacity and authority to agree as they do." *In re Doe*, 90 Haw. 200, 208, 978 P.2d 166, 174 (1999) (quoting *Dowsett v. Cashman*, 2 Haw. App. 77, 83, 625 P.2d 1064, 1068 (1981)).

136. The Modification Approval Notice constitutes BAC Home Loans Servicing's offer to modify the terms of Plaintiff's loan.

[57]

The Modification Approval Notice sets out the specific terms and includes the Loan Modification Agreement and Step Rate Addendum.

137. Plaintiff accepted BAC Home Loans Servicing's offer to modify her original mortgage by executing and delivering to BAC Home Loans Serving, the Loan Modification Agreement and Step Rate Addendum.

138. It is well-settled that consideration is necessary to the enforceability or validity of a contract. *Shanghai Inv. Co., Inc. v. Alteka Co.*, Ltd., 92 Haw. 482, 993 P.2d 516, 530 (Haw. 2000). Consideration is defined as "a bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment." Id. (citing *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997)(further citations omitted). Moreover, "A modification of a contract must be supported by new consideration." Id. (citing *Honolulu Federal Savings and Loan Assn. v. Murphy*, 7 Haw. App. 196, 753 P.2d 807, 813 (Haw. App. 1988)(further citations omitted).

139. Consideration of mutual promises is expressly contemplated by the Loan Modification Agreement and the Step Rate Addendum. The consideration flowing from Plaintiff includes, at least:

> (a) Plaintiff's promise to pay the unpaid principal balance, plus interest, in accordance with the amended terms of the Mortgage and Note as set out in

the Loan Modification Agreement and Step Rate Addendum;

(b)   Plaintiff's promise to comply with any request by BAC Home Loans Servicing to execute and deliver any documents that BAC Home Loans Serving deems necessary with respect to lost or misplaced mortgage documents, notes or modifications; and

(c)   Plaintiff's expense in the total amount of $27.58 that she incurred in the Fed-Ex delivery of the modification documents to BAC Home Loans Servicing; an expense that Plaintiff was asked to undertake as a condition of creating a valid and binding contract in respect of the Loan Modification Agreement.

140. On the basis of the foregoing, Plaintiff submits that that Loan Modification Agreement was a valid and binding contract entered into between Plaintiff and Defendant BAC Home Loans Servicing with the mutual intent to provide a modification on Plaintiff's original mortgage loan.

141. The Revocation Letter sent by Defendant BAC Home Loans Servicing to Plaintiff states that Plaintiff's modification could not be provided at the time because of an "incorrect" or "incomplete" Notary signature. However, the Revocation Letter fails to give specific details as to how the notarization is incorrect or incomplete.

[59]

142. Plaintiff submits that the notarization in question is, in fact, valid under the notarial laws of the State of Washington, where Plaintiff was residing at the time. Revised Code of Washington ("RCW") §42.44.080 provides that "[t]he signature and seal or stamp of a notary public are *prima facie* evidence that the signature of the notary is genuine and that the person is a notary public." The Loan Modification Agreement is both signed and stamped by a Notary Public in the County of King, State of Washington, where Plaintiff was resident at the time.

143. While the ink from the notary stamp is slightly smudged, RCW §42.44.110 states that "[t]he illegibility of any wording, writing, or marking required under this Chapter does not in and of itself affect the validity of a document or transaction."

144. Plaintiff submits that the notarization of the Loan Modification Agreement is, in fact, valid. If this court determines that the notarization is not valid on account of an error or omission, Plaintiff respectfully submits that the error or omission constitutes a *de minimis* technical oversight that should not in and of itself be grounds for invalidating an otherwise legally enforceable contract.

**Defendant BAC Home Loans Servicing's Breach of the Loan Modification Agreement**

145. Plaintiff submits that BAC Home Loans Servicing breached the Loan Modification Agreement when it informed Plaintiff in the Revocation Letter that it was "unable to provide the modification of [her] note at this time", and by subsequently demanding payment by Plaintiff in accordance with the terms of her original mortgage and not the terms of the Loan Modification Agreement.

146. Plaintiff submits that, once the Loan Modification Agreement had been validly constituted, Defendant BAC Home Loans Servicing had no legitimate grounds for denying Plaintiff her full rights under the contract.

147. BAC Home Loans Servicing denied Plaintiff her rights under the Loan Modification Agreement on the basis that the Notary signature or stamp was either incorrect or incomplete when, in fact, both the Notary's signature and stamp are clearly evidenced on the Loan Modification Agreement and therefore *prima facie* evidence that the notary is genuine.

148. Even if the signature and stamp of the Notary is not sufficient for this court to find a valid notarization, Plaintiff submits that the omission constitutes a *de minimis* technical oversight that should not in and of itself be grounds for invalidating an otherwise legally enforceable contract.

[61]

**Damages for Breach of Contract**

149. Plaintiff has suffered significant financial loss as a direct result of Defendant BAC Home Loans Servicing's breach of the Loan Modification Agreement. Plaintiff seeks to recover damages for at least (1) the aggregate accrued difference between what Plaintiff paid under the original mortgage and what Plaintiff ought to have paid under the Loan Modification Agreement as of October 1, 2009, and (2) any and all expenses that Plaintiff has incurred in relation to the foreclosure action currently pending against her, including but not limited to attorney's fees and late payment charges for overdue repayments on her original mortgage.

150. Under the original Note, Plaintiff has a total monthly principal and interest payment of $5,967.10. This amount does not include any escrow payments. Under the terms of the Loan Modification Agreement, Plaintiff should have been paying principal and interest payments in the amount of $4,894.43 per month. Assuming that the terms set out on the Modification Approval Notice are, in fact, the true terms of the Loan Modification Agreement, Plaintiff would be entitled to the reduced monthly payments from October 1, 2009 until September 1, 2014.

151. But for Defendant BAC Home Loans Servicing's breach of the Loan Modification Agreement, Plaintiff would have saved

$1,072.67 per month in principal and interest payments for five years. This represents a total amount of approximately $64,360.20 that Plaintiff would have saved over the course of the five-year reduced interest rate Loan Modification Agreement ("Initial Modification Savings"). To date, Plaintiff would have saved $18,235.39.

152. Plaintiff maintains that, if she were able to pay the reduced monthly amount under the Loan Modification Agreement, she would have been able to satisfy the monthly payments on her Note. As such, Plaintiff would neither have defaulted nor ultimately have faced foreclosure. Put another way, there are reasonable grounds to believe that, but for Defendant BAC Home Loans Servicing's breach of the Loan Modification Agreement, Plaintiff would not have ended up in foreclosure.

153. Consequently, Plaintiff seeks to recover damages for any and all financial loss and expenditure in relation to the foreclosure. Such expenses include, but are not limited to, attorney's fees; late payment penalties; and lost business income since August 2010 on account of Plaintiff's diminished credit rating and subsequent inability to obtain (favorable) credit terms that she otherwise would have been able to obtain.

### CLAIM III
#### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendant BAC Home Loans Servicing)

154. The allegations contained in the preceding paragraphs of this Compliant, particularly ¶¶ 38-41, and ¶¶ 60-91 are incorporated herein by reference.

155. This claim asserts the tort of bad faith.  In *Best Place v. Penn Am. Ins. Co., 82 Haw. 120, 128, 920 P.2d 334, 342 (1996)*, the Hawai'i Supreme Court affirmed that, under Hawai'i law, every contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement.  Whether a breach of this duty will give rise to a bad faith tort cause of action depends on the duties inherent in a particular type of contract. *Id. at 129, 920 P.2d 334.*

156. Tort actions for breach of covenants implied in certain types of contractual relationships are most often recognized where the type of contract involved is one in which the plaintiff seeks something more than commercial advantage or profit from the defendant.  For example, contractual relationships in which the client or customer "seeks service, security, peace of mind, protection or some other intangible." These contracts "create special, partly noncommercial relationships, and when the provider of the service fails to provide the very item which was the implicit objective of the

making of the contract, then contract damages are seldom adequate and the cases have generally permitted the plaintiff to maintain an action in tort as well as contract." *Rawlings v. Apodaca, 151 Ariz. 149, 726 P.2d 565, 575 (Ariz. 1986)* (citing W. Prosser & W. Keeton, Law of Torts § 92 at 660-61 (5th ed. 1984)).

157. Plaintiff submits that her relationship with Defendant BAC Home Loans Servicing is characterized by those special factors that justify a cause of action in tort for breach of implied covenant of good faith and fair dealing.

158. The true purpose of the Loan Modification Agreement was not to provide Plaintiff with a commercial advantage; nor did Plaintiff profit from the contract.   Rather, the objective of the Loan Modification Agreement was to provide Plaintiff with security and protection from foreclosure and peace of mind in knowing that she will be able to keep her home.

159. The threat of foreclosure is undoubtedly a distressing and disrupting ordeal that consumes homeowners who, for a multitude of reasons, are unable to make payments on their mortgages when they become due.   Homeowners who are facing foreclosure turn to loan modification servicers such as Defendant BAC Home Loans Servicing to provide assurance, support and protection, through modification, that allows homeowners to preserve not only the legal interests in their home, but the

[65]

intangible value that they have built up, oftentimes over many years.

160. For most homeowners there is a significant emotional investment in purchasing a home and a sense of pride in maintaining that ownership. It is this emotional investment and sense of pride that homeowners wish to protect when they seek modification. The assurance of lower monthly payments on a modified loan inextricably includes an expectation that the homeowner will be able to stay in his or her home.

161. Moreover, the contractual relationship between the homeowner and the loan modification servicer is based on a fundamental imbalance of power. The unsophisticated homeowner is more likely to be easily misled into a modification process. Homeowners seeking modification do so as a last resort. They are generally in a position of financial vulnerability and are more likely to take the representations and promises of a servicer as an honest attempt to help them keep their homes. As such, the modification servicer has an obligation to deal fairly with the homeowner and refrain from abusing its position of power. While such duty may not rise to the standard of a fiduciary, there are certainly fiduciary elements that characterize this relationship.

162. Plaintiff's contractual relationship with Defendant BAC Home Loans Servicing is premised on these same expectations.

Plaintiff bought the Subject Property with the intention of providing a home for herself and her family over the course of her life and their lives. When Plaintiff fell into financial hardship she turned to Defendant BAC Home Loans Servicing to provide protection, security and the peace of mind that she would be able to continue living in her home.

163. On the basis of the foregoing, Plaintiff submits that her contractual relationship with Defendant BAC Home Loans Servicing contains an implied covenant of good faith and fair dealing, the breach of which gives rise to the tort of bad faith.

164. After Defendant BAC Home Loans Servicing's breach of the Loan Modification Agreement in September 2009, Plaintiff experienced a series of misleading and deceptive practices in her attempts to remedy the alleged inaccuracy in the notarization of the Loan Modification Agreement.

165. First, BAC Home Loans Servicing attempted to revoke a validly formed contract on grounds that the Notary signature was inaccurate or incomplete. Such reasons are entirely unsupported by the facts of this case.

166. Second, BAC Home Loans Servicing did not allow Plaintiff the opportunity to remedy the alleged omission or inaccuracy of the Notary signature; but rather unilaterally revoked the Loan Modification Agreement.

167. Third, Plaintiff continued making payments on her original Note but maintains that she was instructed to refrain from making such payments in order to finalize her modification. Around February 2010, Plaintiff expressed, to an agent of BAC Home Loans Servicing, her concern that her credit rating was being significantly harmed as a result of her missed payments.

168. Fourth, Plaintiff made repeated requests over the course of 11 months for BAC Home Loans Servicing to resend the modification paperwork so that she could remedy the alleged error in notarization. Each time Plaintiff spoke with an agent of BAC Home Loans Servicing she was told that the modification paperwork was being immediately sent out. No such paperwork was ever received by Plaintiff.

169. Lastly, Plaintiff's attempts to communicate with BAC Home Loans Servicing were repeatedly frustrated by a circuitous pattern in which Plaintiff was never allowed to speak to the same BAC Home Loans Servicing agent, as evidenced by Plaintiff's record of each customer service representative with whom she has spoken over the past 22 months.

170. Plaintiff submits that BAC Home Loans Servicing unduly complicated her attempt to remedy any alleged error in the notarization so as to thwart Plaintiff's ability to enforce the Loan Modification Agreement

171. Plaintiff submits that the abovementioned acts committed by Defendant BAC Home Loans Servicing constitutes a breach of the implied covenant of fair dealing and good faith.

## Punitive Damages For Breach of Implied Covenant of Good Faith and Fair Dealing.

172. The issue of tort liability arising from a contractual relationship is not new in this jurisdiction. In *Goo v. Continental Cas. Company, 52 Haw. 235, 473 P.2d 563 (1970)*, the Hawai'i Supreme Court considered merging tort and contract principles when addressing the issue of whether punitive damages should be recoverable for breach of contract. The court acknowledged that Hawai'i allows punitive damages for "wilful, malicious, wanton or aggravated wrongs where a defendant has acted with a reckless indifference to the rights of another." *Id. at 239, 473 P.2d at 566* (citing *Bright v. Quinn, 20 Haw. 504 (1911); Howell v. Associated Hotels, Ltd., 40 Haw. 492 (1954); Glover, Ltd. v. Fong, 40 Haw. 503 (1954)*). In addition, "the scope of what is recognized by common law courts as a tort has grown so that torts and contract are no longer distinct, rather they overlap." *Goo, 52 Haw. at 240-41*, 473 P.2d at 567 (citations omitted).

173. Punitive damages remain firmly established in Hawai'i common law "because [they] continue to serve the useful purposes of expressing society's disapproval of intolerable conduct and

deterring such conduct where no other remedy would suffice. *Masaki v. General Motors Corp., 71 Haw. 1, 780 P.2d 566 at 571 (1989)*. The Supreme Court of Hawai'i, in *Best Place*, "[found] no difficulty in allowing a claim for punitive damages in a bad faith tort cause of action based on the breach of the implied covenant of good faith and fair dealing." *Best Place, 920 P.2d 334*.

174. In order to establish a claim for punitive damages, Plaintiff must prove that the "defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Masaki, at 11, 780 P.2d at 572* (citing *Bright v. Quinn, 20 Haw. 504, 512 (1911)*).

175. Plaintiff submits that Defendant BAC Home Loans Servicing acted with such want of care as to raise the presumption that it was consciously indifferent to the consequences that would arise if Plaintiff was not able to enforce the Loan Modification Agreement. Plaintiff further submits that Defendant BAC Home Loans Serving's breach of the Loan Modification Agreement was done in bad faith and with a spirit of mischief. BAC Home Loans Servicing had no factual or legal grounds for attempting to revoke the contract on the basis

that the Notary signature was incomplete. BAC Home Loans Servicing cited the incomplete Notary signature solely to avoid having to perform its duties under the Loan Modification Agreement.

176. Moreover, Plaintiff submits that Defendant BAC Home Loans Servicing acted willfully and maleficently in failing to deal fairly with Plaintiff over the course of 11 months. The fact that Defendant BAC Home Loans Servicing routinely and intentionally misled, disregarded and unduly delayed Plaintiff's attempts to deal with it over the course of 11 months is clear evidence of Defendant BAC Home Loans Serving's wanton disregard for the consequences arising to Plaintiff as a result of its breach and subsequent conduct.

177. The consequences of Defendant BAC Home Loans Servicing's breach of the Loan Modification Agreement, and its subsequent refusal to deal fairly and in good faith with Plaintiff, extend beyond simple economic loss. Rather, Plaintiff was subject to an unreasonably delayed, complicated and willfully misleading pattern of conduct over the course of 11 months.

178. As with most homeowners, Plaintiff carries a considerable emotional connection to her home. It is a place of refuge and security for her and her family. The unwarranted and persistent threat that she may be forced out of her home,

despite all of her best efforts to deal reasonably and fairly with Defendant BAC Home Loans Servicing, caused Plaintiff significant emotional and mental distress.

179. On the basis of the foregoing, Plaintiff respectfully requests punitive damages for the willful misconduct and entire want of care that Defendant BAC Home Loans Servicing showed Plaintiff in refusing to deal fairly and in good faith with her over the course of 11 months after its breach of the Loan Modification Agreement.

180. Plaintiff further requests punitive damages for the infliction of emotional distress caused to Plaintiff by Defendant BAC Home Loans Servicing's conduct. Defendant BAC Home Loans knew or ought to have known that failing to deal fairly with Plaintiff, and, in fact, willfully deceiving Plaintiff, would exacerbate the insecurity and threat that Plaintiff felt at the thought of losing her home.

### CLAIM IV
### (Unfair and Deceptive Acts and Practices Against the Bank of America Defendants)

181. The allegations contained in the preceding paragraphs of this Complaint, particularly ¶¶ 38-41 and ¶¶ 60-91, are incorporated herein by reference.

182. HRS § 480-2(a) provides in pertinent part that "unfair or deceptive acts or practices in the conduct of any trade or

commerce are unlawful." While the statute does not specifically define the terms "unfair" or "deceptive" acts or practices, the Hawai'i Intermediate Court of Appeals has adopted the definition that "a practice is unfair when it offend established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *Tokuhisa v. Cutter Management Co.*, 122 Haw. 181, 223 P.3d 246, 259 (Haw. App. 2009) (citation omitted); *Balthazar v. Verizon Haw., Inc.*, 109 Haw. 69, 123 P.3d 194, 202 (Haw. 2005).

183. In addition, the Supreme Court of Hawai'i has noted that

> ...[i]t is impossible to frame definition which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to defined unfair practices so that the definition will fit business of every sort in every part of this country.
>
> *Haw. Med. Ass'n*, 148 P.3d at 1209 (citation and internal quotation marks omitted).

184. The Supreme Court of Hawai'i has "referred to the meaning of a deceptive practice by citing the definition employed by federal courts with respect to 'an act causing, as a natural and probable result, a person to do that which he or she would not otherwise do.'" *Balthazar*, 123 P.3d at 202 (citation

and brackets omitted). A deceptive practice has also been defined as having "the capacity or tendency to mislead or deceive." Tokuhisa, 223 P.3d at 259 (quoting State by Bronster v.United States Steel Corp., 82 Haw. 32, 919 P.2d 294, 312, 313 (Haw. 1996)). The Supreme Court of Hawai'i also stated that "actual deception need not be shown; the capacity to deceive is sufficient." *U.S. Steel Corp., 919 P.2d at 313*.

185. The statute also directs courts to construe the chapter "in accordance with judicial interpretations of similar federal antitrust statutes[.]" HRS § 480-3.

186. Hawai'i courts have also adopted a three-part analytical test for "deception" based upon *In re Cliffdale Assocs., Inc., 103 F.T.C. 110 (1984). Tokuhisa, 223 P.3d at 260.* The test states a deceptive act or practice is:

> (1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances [where] (3) the representation, omission, or practice is material.
>
> A representation, omission, or practice is considered "material" if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.
>
> Id. (quotations and internal marks and citations omitted)

187. Moreover, the *Tokuhisa* court clarified that the *Cliffdale Assocs.* test is objective, turning on whether the act or omission "is likely to mislead consumers," as to information

"important to consumers," in making a decision regarding the product or service. Id. (internal marks and quotations omitted). Accordingly, the application of an objective "reasonable person" standard, such as in the *Cliffdale Assocs.* test, is ordinarily for the trier of fact, rendering summary judgment "often inappropriate." Id. (internal marks and quotations omitted).

188. Hawai'i courts have indicated that the terms unfair and deceptive should be interpreted broadly. Specifically, the Supreme Court of Hawai'i and its appellate courts have stated that HRS § 480-2:

> outlaws unfair methods of competition and unfair or deceptive trade practices in sweeping terms. It was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen and businesswomen.
>
> *Han v. Yang, 84 Haw. 162, 931 P.2d 604, 619 (Haw. App. 1997)* (citations, internal quotation marks, and brackets omitted).

**Defendant Countrywide Home's Unfair and Deceptive Acts and Practices in Loan Modification**

189. Plaintiff submits that Defendant BAC Home Loans Servicing has engaged in unfair and deceptive acts and practices in respect of Plaintiff's loan modification.

190. BAC Home Loans Servicing represented to Plaintiff that she must be at least 30 days behind on her mortgage payments before she would be considered for a loan modification. Upon

information and belief, it is not a prerequisite of BAC Home Loans Servicing's modification program that borrowers be delinquent on their mortgage payments in order to qualify for modification.

191. Defendant BAC Home Loans Servicing systematically and purposefully delayed Plaintiff's modification efforts by unfairly closing her file for reasons entirely unrelated to any fault of Plaintiff and were, in fact, the fault of BAC Home Loans Servicing. Plaintiff's first attempt at modification was discontinued because her file was left to sit on the lenders' desk for "too long". There was no further justification for why BAC Home Retention Department closed Plaintiff's file. No information was provided as to a cut-off date by which time her modification request must be considered. It is unfair and unreasonably prejudicial to Plaintiff to discontinue her loan modification request when the fault for such discontinuance lay squarely on BAC Home Loans Servicing.

192. Plaintiff's second attempt at modification was also unfairly terminated. Shortly after resubmitting her documents, Plaintiff was instructed to send in more supporting documents, which she immediately did via facsimile. The following day, Plaintiff called the BAC Home Loans Servicing negotiator, Tracy, to see if there were any further documents that Tracy required. Tracy confirmed with Plaintiff that she had received all

documents necessary to process her loan modification request. The following week, Plaintiff learned that her file had been closed on account of missing information. It is unfairly prejudicial to Plaintiff to have closed her account in this manner. Plaintiff took all reasonable steps necessary to ensure that BAC Home Loans Servicing had all of the documents necessary to process her loan modification request. The negotiator on Plaintiff's account confirmed that she had received all necessary information and no subsequent requests for additional information or documents were made to Plaintiff prior to closing her file.

193. Defendant BAC Home Loans Servicing also misrepresented to Plaintiff, on numerous occasions, the length of time it would take to process her loan modification. BAC Home Loans Servicing systematically disregarded each timeline quoted to Plaintiff and Plaintiff has been attempting to modify her loan for the past 22 months. Plaintiff submits that BAC Home Loans Servicing had no intention of honoring her modification request, despite approving her modification on August 29, 2009. Plaintiff further submits that BAC Home Loans Servicing knowingly and purposefully drew out the modification process so that Plaintiff inevitably ended up in foreclosure. The manner in which BAC Home Loans Servicing delayed the modification process was not only unfair to Plaintiff, but deceptive.

194. BAC Home Loans Servicing further misrepresented to Plaintiff, on numerous occasions, that foreclosure proceedings would not be brought against her in respect of the Subject Property so long as her modification request was under review. Plaintiff called BAC Home Retention Division on August 23, 2010, the same day that the Notice of Foreclosure was issued and filed in the Hawaii Bureau of Conveyances.  At this time, BAC Home Retention Division confirmed with Plaintiff that her file was open and that her loan modification was still under review. However, when Plaintiff called back on August 27, 2010, to inquire about the Notice of Foreclosure and auction date she was told that her file had closed on August 19, 2010.  Plaintiff submits that BAC Home Loans Servicing fraudulently and deceptively backdated the date at which Plaintiff's file was allegedly closed so that her Notice of Foreclosure is seen to be valid.

195. Plaintiff submits that, as a result of BAC Home Loans Servicing's unfair and deceptive practices, Plaintiff has suffered considerable hardship.  She has spent almost two years attempting to modify her mortgage loan, and has been systematically and purposefully misled with the ultimate and foreseeable result that she would end up in foreclosure.

196. BAC Home Loans Servicing's deceptive acts and practices have not only harmed plaintiff, but also offends

established public policy concerns.  The systemic nature of BAC Home Loans Servicing's deceptive practices in loan modification is evidenced by the complaints brought by the Attorneys General of Nevada and Arizona.  It is in the public's interest that Bank of America be held accountable for the unfair and deceptive acts and practices it has systematically and systemically committed in the loan modification process.

**Monopoly Power of the Big Banks and MERS' Role in Controlling the National Mortgage Industry**

197. Monopolization is prohibited by HRS § 480-9, which is taken from the *Sherman Act*, 15 U.S.C. § 2. The Hawai'i Supreme Court, in *Island Tobacco I*, stated: "The offence of monopoly under Section 2 of the *Sherman Act* has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Island Tobacco Co. v. R.J. Reynolds Tobacco Co.,* 627 P.2d 260, 274 (Haw. 1981) (quoting *U.S. v. Grinnell Corp.,* 384 U.S. 563, 570-571, overruled on other grounds by *Robert's Haw.Sch.Bus, Inc., v. Laupahoehoe Transp. Co., Id.*).

198. In *Island Tobacco II*, the federal court identified the elements of an "attempt to monopolize" claim as involving "(1) a specific intent to control prices or destroy competition with

respect to a part of commerce; (2) predatory conduct directed toward accomplishing the unlawful purpose; (3) a dangerous probability of success." *Island Tobacco Co. V. R.J. Reynolds, 513 F.Supp. 726 (D. Haw. 1981)*.

199. Plaintiff is informed and believes and on that basis alleges that the Countrywide Defendants and the Bank of America Defendants, along with several other large private banking institutions operating within the United States sued herein as Does Defendants 1-10 (collectively "the Big Banks"), agreed, beginning in or about 1994, to a scheme by which they would, and in fact did, set up a private system of recording interests in land in the United States, that would give them a competitive advantage over smaller banking institutions to transfer mortgage loans freely into securitized pools of like mortgages; this system became Defendant MERS. The MERS system was designed to circumvent and, as envisioned by its originators replace, the traditional system of public recordation of mortgages.

200. Plaintiff is further informed and believes and on that basis alleges that subsequent to the creation of MERS, the Big Banks used their combined market power in the financial industry to take control of the market for private securitization of mortgages, to the virtual exclusion of smaller banking institutions, such that virtually all privately securitized mortgage loans are in trust to or serviced by the Big Banks.

201. Plaintiff is further informed and believes and on that basis alleges that subsequent to the creation of MERS, the Big Banks were able to and did control the administration and servicing of virtually all private securitization of pooled mortgages and the capital they generated, such that other smaller banking institutions of the United States have been virtually excluded from private sources of capital for funding residential mortgage loans, unless they were willing to join into the MERS system, and sell the mortgages they originated into the mortgage pools set up and controlled by the Big Banks, such that those institutions are denied the benefits of the interest generated by such mortgages and the income generated from servicing those mortgages.

202. Plaintiff is further informed and believes and on that basis alleges that subsequent to the creation of MERS, smaller banking institutions in the United States have been forced out of the residential lending market, and instead were forced to engage in much more speculative forms of lending, such as construction and development loans to builders, and small to medium sized commercial and industrial real estate loans.

203. Plaintiff is further informed and believes and on that basis alleges that subsequent to the creation of MERS, the Big Banks and MERS used their control over the residential mortgage market by inflating the market for residential properties in the

United States and thereby increasing the proportionally-based fees that such larger loans would generate.

204. Such inflation manifested itself in a complete inversion of the order of mortgage loan creation and securitization. The Big Banks' pursuit of increased profits created a system of lending in which security instruments (mortgages and deeds of trust) are created, securitized and marketed to investors prior to any loan actually being originated. These securities are specifically tailored to meet the demands of investors in the secondary market. Each pool of mortgages that are securitized and sold to investors consist of certain specified features, including loan amounts, interest rate structures, and levels of risk. It is only after the securities are already sold to investors with "place holder" assets that the Big Banks would send out "orders" for mortgage loans that met the criteria set forth in the security's prospectus.

205. The "orders" would then be transmitted to loan originators, whether they were units or subsidiaries the Big Banks or independent brokers. The originators would be "encouraged" to make loans of the type specified in the orders, since those loans were the ones most likely to be purchased and securitized. The originators would then be under pressure to make such loans to their customers, regardless of the customers'

needs and without regard to the customers' ability to meet the terms and conditions of the loan.

206. The Big Banks, in effect, control the national mortgage market. The Big Banks have significant enough market power to steer customers toward larger loans, while steering customers away from loans that may otherwise be more appropriate for their lifestyles.

207. Plaintiff is further informed and believes and on that basis alleges that the Big Banks also depended upon MERS to give them an economical and efficient way of recording mortgages – a process necessary to secure interests in the real property. However, the legal reality of this process is that it obfuscates or "clouds" the true relationship between the borrower and the lender. Once residential property values started to decline and borrowers fell into financial distress with the economic crisis, the inability to trace true ownership of property has essential.

208. The commercial reality of securitized mortgages is that, at some point along the process of securitization, the chain in title is broken. The inability to establish a clear chain in title to Plaintiff's mortgage has several potentially harmful consequences. First, if the note and mortgage has been transferred away from the originating lender to numerous third parties along a chain of securitization, Plaintiff may not be

making payments to the party who has the legal authority to enforce her note.

209. More significantly, Plaintiff's attempts to modify her loan may be severely frustrated if the counterparty to the modification agreement does not have the legal authority to enter into any such modification agreement with Plaintiff.

210. The commercial uncertainty that accompanies the "clouded" titles of securitized mortgages extends beyond the potential problems faced by borrowers, such as Plaintiff. This uncertainty extends to third party purchasers who believe they are purchasing property from a counterparty that, in fact, does not actually hold legal title to the property.

## CLAIM V
### (Injunctive Relief Against Defendants BNY Mellon)

211. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

212. Plaintiff has alleged facts that demonstrate a likelihood that Plaintiffs will succeed on the merits of their claims set forth in this Complaint.

213. Defendant U.S. Bank, as Trustee for the Trust, intends to conduct a non-judicial foreclosure sale of the Subject Property pursuant to a notice served upon them on August 23, 2010.

214. Plaintiffs allege that, should Defendant U.S. Bank follow through with its stated intention to foreclose upon the Subject Property, they will suffer irreparable harm, including, but not limited to loss of their rights to rescind or otherwise modify their mortgage loan, loss of the use and enjoyment of the Subject Property, and loss of their right to exclude others from entering, making use of, or removing things of value from the Subject Property.

215. Plaintiff further alleges that the balance of hardships between her and Defendant U.S. Bank falls firmly and unequivocally in her favor. Plaintiff depends on the Subject Property as her and her family's home, while Defendant U.S. Bank is a large business organization with ample assets upon which to depend, and has no interest in the Subject Property beyond selling it to a third party.

216. Plaintiff, therefore, seeks an order from the Court enjoining Defendant U.S. Bank from conducting the sale of the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually agreed settlement made between all parties to this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demand Judgment against Defendants, as follows:

(a)  For an order enjoining U.S. Bank from foreclosing upon the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually agreed settlement made between all of the parties to this action;

(b)  For a judgment awarding statutory damages in such amounts as shall be established at the time of trial;

(c)  For a judgment awarding punitive damages in such amounts as shall be established at the time of trial;

(d)  For a judgment awarding treble damages according to proof;

(e)  For a judgment awarding reasonable attorney's fees according to proof;

(f)  For a judgment awarding compensatory damages in such amounts as shall be proven at time of trial;

(g)  For costs of suit incurred; and

(h)  For such other relief as the Court deems just and equitable.